# EXHIBIT

# B

FEDERAL MEDIATION AND CONCILIATION SERVICE
OFFICE OF ARBITRATION SERVICES

**LABORERS INTERNATIONAL UNION
OF NORTH AMERICA, LOCAL 576,**

      Union,

v.                                                 FMCS No. 191015-00474
                                                          (Subcontracting)

**CHURCHILL DOWNS RACETRACK,
LLC,**

      Company.

**OPINION AND AWARD**

**Mark C. Travis, Arbitrator
Date of Award: July 24, 2019**

**Appearances for the Parties:**

For the Union:      David O'Brien Suetholz, Attorney
                          Branstetter, Stranch & Jennings, PLLC
                          dave@unionsidelawyers.com.

For the Company:    James U. Smith, Attorney
                          Smith & Smith, Attorneys
                          jus@smithandsmithattorneys.com.

**I.     PROCEDURAL BACKGROUND**

      This matter arises under a Collective Bargaining Agreement (hereinafter "CBA") entered into by the Laborers International Union of North America, Local 576 (hereinafter "the Union") and Churchill Downs Racetrack, LLC (hereinafter "the Company" or "CDRT") on February 15, 2018. (Joint Exhibit 1).[1] The grievance arising under the CBA was filed by the Union's Business Manager, Cornelius Cotton, Sr. on September 19, 2018, alleging a violation of Articles I and XXI of the CBA. (Jt. Ex. 2). The grievance was denied by Justin Paul, the Company's Vice President and Associate General Counsel, on September 27, 2018. The undersigned was selected

---

[1] Hereinafter abbreviated "Jt. Ex."

1

by the parties and duly appointed by the Office of Arbitration Services of the Federal Mediation and Conciliation Service on December 4, 2018. A full evidentiary hearing was conducted in Louisville, Kentucky on March 15, 2019 at which time the parties had full opportunity for the introduction of documentary evidence and examination of witnesses. Briefs were duly filed by the parties on May 22, 2019 and the record was closed.

## II. ISSUE

The Arbitrator has framed the issue for determination as follows: "Did the Company violate the CBA by contracting out housekeeping and maintenance duties at its location of 4520 Poplar Level Road, and if so, what is the appropriate remedy"?

## III. RELEVANT CONTRACT AND POLICY PROVISIONS

### AGREEMENT

THIS AGREEMENT made this 15th day of February, 2018 by and between CHURCHILL DOWNS RACETRACK, LLC, 700 Central Avenue, Louisville, Kentucky 40208 ("Churchill Downs" or "Employer" or "Company"), and KENTUCKY LABORERS' DISTRICT COUNCIL AND ITS AFFILIATE, LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, LOCAL UNION NO. 576, AFL-CIO, Louisville, Kentucky, (hereinafter referred to as the "Union.").

\* \* \* \* \*

### ARTICLE 1
### RECOGNITION

Section 1.    The Employer hereby recognizes the Union as the sole collective bargaining agent with respect to wages, hours, rates of pay, and other conditions of employment for all full-time, hourly, maintenance department and housekeeping Employees employed at 700 Central Avenue, and 4520 Poplar Level Road ("Trackside"), Louisville, Kentucky facilities, including all Employees of the Employer engaged in general maintenance of the track and its facilities, and including truck drivers, mechanics, tractor operators, landscape employees, general laborers and maintenance personnel, janitorial services; and excluding office clerical Employees, restroom attendants, guards and/or watchmen, professional Employees and supervisors as defined in Section 2(11) of the National Labor Relations Act, and casual labor as defined in Section 3.

Section 2.    For the purpose of this Agreement, janitorial work at Churchill downs and/or Trackside will consist of:

> General cleanup
> Weed pulling

    Sweeping
    Any type of actual cleaning
    Window washing
    Mopping, scrubbing
    Picking up, and other duties traditionally performed by janitors

Section 3.    For the purpose of this Agreement, casual labor at Churchill Downs and/or Trackside is defined, except in an emergency, as the following work:

    Grass cutting
    Weed pulling
    General cleanup
    Janitorial work (excluding recreation hall)

For the purpose of this paragraph, an emergency is defined as illness, death, vacation, other extenuating circumstances and limited to thirty (30) days.

* * * * *

## ARTICLE II
## MANAGEMENT RIGHTS

Except as otherwise limited by the provisions of this Agreement, the Company shall have the following rights:

1.    The Company shall have the full and exclusive direction, control and Management of the racetrack in its operation in order that a maximum of efficiency may be maintained both in connection with the work of the Employees as well as in connection with the facilities, machinery and devices to be used.

2.    The Company shall have the right to determine, regulate and modify the starting time and the number of Employees that may be assigned or allocated to a job, operation or department. The Company shall notify the Union within 24 hours of any changes.

3.    The Company shall exercise the regular and customary functions of management, including the right to establish, enforce, change, abolish, or modify existing rules and policies, applicable to employees covered by this Agreement and to establish, enforce, change, abolish or modify operational procedures as it deems necessary and to discipline employees for just cause. As long as the Company's policies and procedures do not conflict with the tenets of this contract, those policies and procedures will govern. The Company shall have the right to establish and enforce reasonable quality and service standards for its employees, business and services and to evaluate employees based on such quality and service standards. The Union will have the right to grieve the reasonableness of such standards.

4.    The Company shall have the right to determine whether and to what extent the Company's business and the work required in its business shall be performed by employees covered by this Agreement.

5.      The failure by the Company to exercise its full rights of management in one situation will not preclude the Company from exercising its rights in future instances. The enumeration of management prerogatives herein is not intended to be inclusive, nor is it the intent of this article to interfere with employee rights granted under this Agreement.

* * * * *

ARTICLE XXI<br>
EXPANDED WAGERING

If the Company introduces at Churchill Downs Racetrack or Trackside any form of wagering in addition to pari-mutuel wagering, the Company agrees that such expanded wagering will not affect the Union's right to continue to represent Housekeeping and Maintenance personnel consistent with their rights under this Agreement.

* * * * *

EXHIBIT A

CLASSIFICATION AND WAGE RATES

The Employer in its discretion may raise an Employee to a regular hourly rate of pay any time prior to the Employee's two-year anniversary date. In addition, the Employer has the right to hire part-time Employees after the close of the Spring Race Meeting and must terminate these Employees prior to the beginning of the Fall Race Meeting.

* * * * *

## IV.   SUMMARY OF THE EVIDENCE

The facts of this case, as in many involving contract interpretation, are largely undisputed. The Company, Churchill Downs Racetrack, LLC, (or "CDRT") is a wholly owned subsidiary of Churchill Downs Incorporated, which owns and operates several thoroughbred horse racing tracks throughout the United States. The location at issue in this case is located at 4520 Poplar Level Road, Louisville, Kentucky (referred to as "Trackside"). Also covered by the CBA is the Company's location at 700 Central Avenue in Louisville, Kentucky (commonly referred to as Churchill Downs, the location of The Kentucky Derby). Both locations are operated by CDRT.

By way of background, the Poplar Level location was formerly a harness racing track. It was purchased by the Company in 1992 and renamed "Trackside" at that time. The Company operated this location as a boarding and training facility for thoroughbred horses, but more importantly for this case, operated the location as a wagering facility, simulcasting and allowing

4

pari-mutuel wagering on horse races from other racetracks when Churchill Downs was not running live races. In 2005, the simulcast operation was moved to the Churchill Downs location. During that period, the only simulcast wagering offered at Trackside was for races actually being held at Churchill Downs. The wagering facility at Trackside during this time was referred to as "Sports Spectrum." In 2012, however, the Trackside wagering facility at Poplar Level was demolished by the Company and in 2017 the Company began construction of a new gaming facility which opened in 2018, known as Derby City Gaming (hereinafter "DCG"), a wholly owned subsidiary of the Company, which offers pari-mutuel wagering in a HRM (historical race wagering) format.

The applicable contract provisions at issue in this case underwent some revision in the negotiations for a new CBA in 2013. At that time, Article II, Management Rights, was expanded to include paragraphs four and five:

> 4. The Company shall have the right to determine whether and to what extent the Company's business and the work required in its business shall be performed by employees covered by this Agreement.
>
> 5. The failure by the Company to exercise its full rights of management in one situation will not preclude the Company from exercising its rights in future instances. The enumeration of management prerogatives herein is not intended to be inclusive, nor is it the intent of this article to interfere with employee rights granted under this Agreement.

(Jt. Ex. 5). According to the Company's evidence, this change was intended to expand its flexibility in subcontracting maintenance and housekeeping functions. According to Ryan Jordan Senior Vice President and General Manager, the lead negotiator for the Company, the purpose of the change was to memorialize what was already being done in terms of general landscaping, housekeeping and maintenance, in order to effectively manage the Company's business. As to more specifics, Chris Volz, Business Agent for the Union and a participant in the negotiations, testified to discussions regarding the language change. He stated that Jordan indicated it was "for sponsorship". In his testimony regarding specific discussions regarding the change, Jordan explained as follows:

> "[I]t was really to ensure that we had the ability to operate our business, we had the flexibility to maintain, through – to subcontract and to outsource functions of our business if we needed as business dictated."

(Transcript, p. 201).

> "We discussed, with specific language in Section 4 and 5, that we wanted the ability to outsource or subcontract functions of those departments if the opportunity presented and it was the right business decision for us. We ultimately wanted flexibility. We gave an example of if a sponsorship opportunity came with a company that could perform these functions, we wanted to be able to enter into that – into that contract and not have language here that precluded us from doing that."

(Transcript, pp. 210-11).

In any event, there does not appear to have been any change in this language from the time of the initial proposal to the Union on January 15, 2013, continuing through submission of the Company's final proposal on February 14, 2013, and to ratification. (Company Exhibits 1, 2).[2] Subsequently, there was no change in this operative language in the 2018 negotiations which it appears were taking place during the construction of the new facility at Poplar Level.

As indicated above, the Company began its HRM wagering operations at Poplar Level in 2018 under DCG. It is undisputed and stipulated that there are no bargaining unit employees performing any maintenance or housekeeping work at DCG, nor or there any employees of DCG who are employed in the bargaining unit. Rather, DCG is operated by a separate management team which entered into a subcontract agreement with C&W Facility Services to provide all housekeeping and maintenance services at the DCG location. The evidence does reflect the boarding and training facilities at Poplar Level are separate and distinct from DCG and bargaining unit employees do continue to perform maintenance on that part of the location.

## V.   POSITIONS OF THE PARTIES

<u>The Union's Position.</u> The Union's threshold position is that the Company has acknowledged in its grievance response that pursuant to Article I the Union is the exclusive bargaining agent for all of the Company's housekeeping and maintenance employees at the two Louisville locations, but that provision did not apply to workers at DCG on Poplar Level as those individuals were not employees of DCG, but rather a third party contractor. The Union points out that this is consistent with the parties' stipulation that there are no Company employees performing maintenance or housekeeping at the Poplar Level location, and further that Article I

---

[2] Hereinafter abbreviated "Co. Ex."

6

would cover any maintenance or housekeeping employees of the Company at that location. (Transcript, pp. 12, 131).

More specifically, the Union argues it has not waived its ability to contest the Company's actions in this case based upon a subsequently-filed grievance it chose not to take to arbitration. On this issue, the Union asserts any alleged acquiescence by the Union would only relate to past violations, and not to future conduct and remedies. Additionally, the Union points out that the testimony of Volz reflected the non-pursuit of the grievance was based on assurances from a Company representative that the action would not occur again.

The Union also posits the Recognition clause in Article I specifically addresses and covers employees employed at the Poplar Level location where the Company operates DCG. Beyond the language in Article I, the Union further argues at length regarding extrinsic evidence supporting its interpretation of the CBA. With respect to past practice, the Union acknowledges the Company has used subcontractors in the past, but only to supplement bargaining unit members' work, and not to totally supplant bargaining unit functions, such as the case at DCG. Further, the Union argues that while subcontracting may fall within the coverage of a management rights clause based on a reasonable business decision, it cannot be used to as a device against the integrity of the bargaining unit where, as here, "maintenance department and housekeeping employees" are specifically the employees covered by the CBA as reflected in Article I and Exhibit A to the CBA.

The Union notes that the term "subcontract" is not used in the CBA, and the fact that the CBA otherwise limits the extent to which non-bargaining unit employees can be utilized in Exhibit A to the CBA, dealing with the limited use of part-time employees. Along that line, the Union argues that Article XXI of the CBA impliedly guarantees to the Union its right to maintain bargaining unit work at Poplar Level wherein it provides that if additional forms of wagering are permitted there, such "will not affect the Union's right to *continue* to represent Housekeeping and Maintenance personnel consistent with their rights under this Agreement." (Emphasis supplied).

With respect to the Company's arguments relative to the parties' bargaining history on Article II, the Union asserts the Company's explanation does not support the action taken here.

Specifically, the Union points out that Jordan's testimony indicated the language change was to memorialize what was already being done as well as to allow for the use of sponsorships. What was being done, according to the Union, was the use of subcontractors working alongside bargaining unit members. The Union also argues that the Company's intent to expand its use of subcontracting should have been made clear during the bargaining process, instead of being cloaked in undisclosed purposes.

In conclusion, the Union asserts the Company's actions in this case subverts the parties' bargaining relationship and is at odds with the language in Article II, Section 5, which provides: "The enumeration of management prerogatives herein is not intended to be inclusive, nor is it the intent of this article to interfere with employee rights granted under this Agreement." Taken to its logical conclusion, the Union notes that the Company's position could effectively authorize the complete contracting out of all bargaining unit work.

The Company's Position. The Company asserts that the clear language of Article II, Section 4, as supported by the testimony of Jordan, gives it the right to subcontract housekeeping and maintenance functions at DCG. In response to the Union's argument that any right to subcontract advanced by the Company is restricted by the Recognition clause in Article I, the Company posits that a general recognition clause does not preclude subcontracting. Rather, the Company argues, Article I simply identifies the employees in the bargaining unit for purposes of collective bargaining. Along that same line, the Company argues that the change to Article II in the 2013 negotiations was clear and obvious, and there were no objections or discussions relative to the change during the negotiations; nor was there any issue raised with the provision in the 2018 negotiations. Similarly, the Company notes that the Union witnesses failed to point to any language in the CBA which limited the right to subcontract. To sustain the grievance, the Company thus asserts, would be to read restrictions into the CBA which were never negotiated or were at least acquiesced to by the Union.

The Company further points out that there is a history and practice of the Company utilizing contractors which, according to the testimony of Union witnesses, perform the same duties as the bargaining unit employees during the periods they are utilized. The Company supports this argument by showing the outsourcing of various housekeeping and general maintenance at Churchill Downs since the 1990's. (Co. Ex. 3). The Company also asserts that

8

the Union's argument regarding Article XXI, Expanded Wagering, is misplaced. Simply stated, the Company points out that there is not "any form of wagering in addition to pari-mutuel wagering", so the provision has no threshold application to this case. Finally, the Company asserts the Union's reliance on Exhibit A to the CBA is similarly misplaced, as the language there only constricts the Company's right to hire and terminate "part-time employees," yet there are no employees of the Company whatsoever performing maintenance or housekeeping work at DCG, and further that nothing in Exhibit A otherwise prevents subcontracting such work. Indeed, the Company points out that a grievance was subsequently filed by the Union regarding the use of part-time employees, which grievance was never pursued to arbitration. (Co. Ex's 4, 5).

## VI. DISCUSSION AND ANALYSIS

In any case involving subcontracting, the employer's legitimate interest in efficient and economical operation must be balanced against the union's legitimate interest in protecting the job security of its members and the exclusive bargaining relationship. Absent a contractual restriction, subcontracting is generally allowed, so long as it is done in good faith and based on a reasonable business decision, and does not subvert the labor agreement and/or seriously weaken the bargaining unit, or parts thereof.

Of course, in this case, the Company asserts the language in Article II, Section 4, gives it the authority to engage in subcontracting. While the language in that provision could certainly be interpreted to authorize the use of subcontracting, the Company's decision is not an unfettered one, and it must still be balanced with the contract's terms as a whole, the business decision, the integrity of the bargaining unit, and other extrinsic factors relevant to the decision.

The Company's principal argument is that Article II, Section 4 controls the disposition of this case, but the Union argues that the Recognition clause in Article I limits the Company's decision. While there is certainly authority (cited by the Company) which holds recognition clauses do not limit subcontracting, there is similarly authority to the contrary.[3] As Arbitrator Skratek noted in *Port of Seattle, Wash.*, 110 LA 753, 756-757 (1998):

---

[3] The undersigned concludes the principal case cited by the Company is not quite on point for the issue here. In *Singer Co.*, 71 LA 204 (Kossoff 1978), the recognition clause covered "[a]ll production and maintenance employees

9

> The Arbitrator can find no specific restriction against contracting out within the Agreement but does concur with the findings of previous Arbitrators who have ruled that an employer's ability to contract out work is limited by the recognition clause, the union security clause and the other provisions in the contract which confer benefits upon bargaining unit employees.

*See also*, *A.D. Julliard Co.*, 21 LA 713, 724 (Hogan, 1953) (taking recognition clause together with wage and seniority clauses, inappropriate to transfer jobs listed therein).

In this case, evaluating the merits on this argument alone, the undersigned does not concur with the Company's position. Again, while the terms of Article II, Section 4 could be interpreted to authorize subcontracting (although not specifically mentioning the term), other language in the CBA can be read to limit that construction. Specifically, the Recognition clause in Article I explicitly states the Company "hereby recognizes the *Union as the sole collective bargaining agent* ... for all full-time, hourly, *maintenance department and housekeeping Employees* employed at 700 Central Avenue and *4520 Poplar Level Road*...." (Emphasis supplied). Additionally, Section 5 of Article II, which was added to the CBA at the same time as the language in Section 4 relied upon by the Company, stated it was not "the intent of this article to interfere with employee rights granted under this Agreement". Those employee rights can be found not only in the Recognition clause, but with reference to Exhibit A, which specifically and predominantly deals with maintenance and housekeeping employees. Further, as the Union points out, Article XXI addresses the preservation of housekeeping and maintenance work at both Churchill Downs and Trackside in the event additional forms of wagering are authorized by law. While this provision is not controlling as additional forms of wagering have not been introduced, it does provide support for the Union's argument by stating the Union shall "continue" to represent housekeeping and maintenance employees at those locations in case additional wagering is introduced by the Company. Based on the foregoing, the undersigned does not agree with the Company's position that the terms of Article II, Section 4, control the disposition of this grievance.

---

including truck drivers of the Employer's ... facility EXCLUDING office, clerical and professional employees, guards and supervisors as defined in the Act." (Emphasis in original). Despite the exclusion of guards from the certified unit, the very first agreement negotiated between the parties included "Watchmen" among the job classifications listed in the agreement in an appendix of wage rates and job classifications. The Employer subsequently subcontracted its guards to an outside contractor. That is clearly not the case here, where the recognition clause specifically names housekeeping and maintenance employees - the employees displaced by the contractor at DCG.

10

Looking beyond the contract itself, the undersigned will evaluate the other factors argued by the parties. Of course, the Company asserts the bargaining history supports its position, in that the Union agreed to the insertion of Article II, Section 4 in the 2013 negotiations, and did not negotiate for its removal in the 2018 negotiations. Notwithstanding the undersigned's decision above that the language in that section is not controlling, neither does the bargaining history support the conclusion urged by the Company. The testimony of Jordan regarding the intent for the bargaining proposal and the explanation provided was to allow more flexibility, to memorialize what was already being done, and to allow the opportunity for sponsorships. However, the evidence does not support those justifications or explanation. Other than "flexibility", nothing further was offered as to the business rationale behind the decision, either in bargaining or in the hearing.[4] With respect to memorializing the current practice, that is likewise unsupported. While clearly some subcontracting had been performed in the past, the action taken by the Company in this situation is clearly beyond what had been done in the past, i.e., outsource the entire housekeeping and maintenance function for an entire facility covered by the CBA. While bargaining is indeed an adversarial process and parties should tread cautiously, the evidence submitted by the Company was that it "wanted the ability to outsource or subcontract *functions of those departments*" and provided the Union an example of needing the discretion to allow sponsorship opportunities. (Emphasis supplied). Again, outsourcing the entire housekeeping and maintenance function at one of the two locations covered by the CBA goes well beyond that expressed intent.[5]

Along this same line, the parties' past practice does not support the Company's argument. As stated above, it is undisputed that some subcontracting had been conducted by the Company over the years, since the 1990's. However, the evidence reflects that bargaining unit employees performed work at the wagering facility at Trackside (referred to as Sports Spectrum) before it was demolished in 2012 and replaced by the facility operated by DCG in 2018. There is no past practice of housekeeping and maintenance functions at the Trackside wagering facility being

---

[4] Clearly, one of the factors in supporting a subcontracting decision is the business rationale. While business judgment is entitled to considerable deference in this context, there was nothing further offered in the evidence on this issue other than "flexibility" to operate the business, without more.

[5] There was no evidence of any sponsorships entered into with the Company as of the date of the hearing.

11

conducted exclusively by an outside contractor, which is the case now. This argument is not supported by the evidence.[6]

Other extrinsic factors relevant to a subcontracting decision are relevant here - one of which is type of work performed in the subcontracted relationship. While there was great argument between the parties on whether the work previously performed by subcontractors was a "core function", that is not the issue. Rather, if the work being performed by the subcontractor is in fact the type of work performed by the bargaining unit, the decision is generally subject to greater scrutiny. In this case, there is no dispute that the nature of the work is the same, i.e., that the housekeeping and maintenance work at DCG is being conducted exclusively by a subcontractor.

All of the above taken into consideration, there is even a greater issue with the Company's action here. As noted above, one of the primary considerations in a subcontracting case is the effect on the bargaining unit and the parties' bargaining relationship. The decision to subcontract cannot be allowed to prejudice the status and integrity of the bargaining unit. The Union's argument is correct that taken to its logical conclusion, the Company could contract out *all* maintenance and housekeeping jobs covered by the CBA. For example, if an award upholding the Company's decision here were sustained as precedent, the Company could ostensibly decide to create a new subsidiary for the operation of Churchill Downs and subcontract all housekeeping and maintenance duties at that location as well. That is a slippery slope indeed, and one that cannot be sanctioned in this case. As stated by Arbitrator Skratek in *Port of Seattle, Wash.*, 110 LA 753, 757 (1998):

> Subcontracting of bargaining unit work, would enable Management to effectively eliminate the Union's ability to provide job security for its membership. If this Arbitrator were to permit the unilateral transfer of bargaining unit work to an independent contractor, she would be *undermining all of the bargaining unit positions that have been recognized as being part of this unit.* No job would be free from outsourcing.

(Emphasis supplied).

---

[6] Nor does the December 6, 2018 grievance have any material relevance to this case. That grievance was filed after the grievance at issue here, and relates to part-time employees at Churchill Downs working in violation of Exhibit A to the CBA. The alleged contractual violation is separate and distinct from this case.

## VII.   AWARD

After careful consideration of all arguments, testimony, and evidence, and for the reasons set forth in the analysis above, it is awarded as follows:

1. The grievance is sustained. The Company violated Article I of the CBA by subcontracting all housekeeping and maintenance functions at its wholly owned subsidiary, Derby City Gaming, LLC, to C &W Facility Services.
2. The Company is hereby directed to assign housekeeping and maintenance work at Derby City Gaming, LLC to bargaining unit employees.
3. Bargaining unit members who were not offered the opportunity to perform work assigned to employees of C &W Facility Services, shall be made whole for all lost wages and benefits sustained.
4. The Arbitrator shall retain jurisdiction of this award for sixty (60) days for the sole purpose of resolving any disputes related to the implementation of the Award. In the event any issue or question is raised during said 60-day period, jurisdiction shall be extended until such issue is fully and finally resolved.

Date: July 24, 2019

*/s/ Mark C. Travis*

Mark C. Travis, Arbitrator

13